Christopher J. Gramiccioni
Admitted to practice in NJ, NY, SC, DC
Email: chris@kingstoncoventry.com

Deborah L. Gramiccioni
Admitted to practice in NJ, NY, SC
Email: deb@kingstoncoventry.com



January 22, 2024

Via Electronic Filing

The Honorable Bruce Howe Hendricks
United States District Judge
U.S. District Court for the District of South Carolina
P.O. Box 835, Charleston, SC 29402

      Re:    *United States v. Fredrick Wendell McCray*
               Docket No. 2:22CR00139-001

Dear Judge Hendricks:

      Please accept this sentencing memorandum in lieu of a more formal motion on behalf of Fredrick McCray in the above-referenced matter. Mr. McCray is a forty-four (44) year old black man who comes before this Court with remorse and contrition, having accepted personal responsibility for his offenses. His previous criminal history brought his conduct within the purview of 18 U.S.C. § 922(g)(1). Fredrick McCray proffers no excuses for his conduct but respectfully requests that the Court consider his age, personal and criminal history holistically and mindful that his upbringing and persistent struggles with substance abuse offered him limited options. He has smoked marijuana "daily" since his teen years and started consuming Percocet to that same degree was in his twenties, continuing to use those narcotics regularly until the day before his arrest. PSR at ¶129.

      Mr. McCray's' criminal and juvenile history, moreover, reveals he has grappled with familial instability and substance abuse long before reaching adulthood. Despite indicating to Probation that he maintained a good relationship with his parents, Mr. McCray's father was only 13 years old and his mother was only 17 years old when Fredrick was born. PSR at ¶ 122.

      As a young boy, Mr. McCray engaged in runaway behavior, truancy and stealing, all before he reached the age 14, clearly demonstrating an absence of virtually any supervision at home. PSR at ¶¶ 43-48. He withdrew from school *in the sixth* grade. PSR at ¶ 130. Perhaps not surprisingly, Mr. McCray's first interaction with narcotics came as early as 14 years old, PSR at ¶ 49, and his troubles as a child seemed to proceed unabated into adulthood, without meaningful familial supervision or crisis intervention.

      These struggles notwithstanding, Mr. McCray has consistently prioritized his family life as an adult, starting a lawn care business in 2019 and supporting his wife and two children, with whom he lived prior to the instant conduct. PSR at ¶ 132. Mr. McCray describes himself as an "easy going person" with a "big heart." PSR at ¶ 125. He comes before the court ready to

"accept responsibility for his actions and serve his time in prison so he can move on with his life." Id. Mr. McCray has consistently expressed remorse for his actions and has cooperated with Probation during its pre-sentence investigation. PSR at ¶ 42.

## I. <u>Guideline Sentencing Calculation</u>

While Mr. McCray initially disputed certain provisions of the PSR through prior counsel, he recognizes that the government could meet its lower burden as it pertains the most of those objections. To avoid an unnecessarily lengthy sentencing proceeding involving testimony, Mr. McCray has withdrawn all factual objections to the PSR and challenges only the application of a 4-level vice a 2-level role increase under §3B1.1(a).

### *§3B1.1 Aggravating Role Adjustment*

Probation avers that a 4-level adjustment is warranted on their assertion that defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." PSR at ¶ 96. This leadership role adjustment lacks substantiation. Probation only states that "[t]he numerous wiretap interceptions made clear McCray was the leader of a drug trafficking organization that involved five or more participants." PSR at ¶39. However, Probation does not describe any organizational hierarchy; it merely repeats that this was a drug trafficking organization (DTO) of which Mr. McCray was the leader and directed other members of a so-called "gang," which included Cornelius Walker, Kenneth Brown and Earl Allen and Kevin Dukes. See id. There is nothing in the report to suggest this defendant controlled the behavior of others. There is no evidence of him paying underlings to distribute narcotics. It does not show Mr. McCray enjoying a larger share of the proceeds. Mr. McCray's role in the instant offense can best be described as a 'mid-level' supplier of loosely connected dealers. That is, at best he served as a conduit between higher-level drug suppliers and street level drug dealers who would ultimately sell to drug users. Mr. McCray also was not the only supplier to the alleged DTO. The PSR reveals that other individuals supplied Mr. McCray and other co-defendants.

"The burden is on the government to prove by a preponderance of the evidence that the [Section 3B1.1] sentencing enhancement should be applied." United States v. Steffen, 741 F.3d 411, 414 (4th Cir. 2013). The Fourth Circuit has reversed the imposition of a role enhancement where, as here, the record does not provide justification for the enhancement. "In cases where this Court has affirmed the application of an aggravating role adjustment under USSG § 3B1.1(b), there existed on the record evidence that the defendant actively exercised some authority over other participants in the operation or actively managed its activities." United States v. Slade, 631 F.3d 185, 190 (4th Cir. 2011). "This adjustment is warranted only where the Government demonstrates that the defendant 'was an organizer, leader, manager or supervisor of people,' and only where a defendant wields the '***actual*** exercise of control' over those people. United States v. Wilson, 832 Fed. Appx. 147, 155-156 (4th Cir. 2020) (quoting Slade, 631 F.3d at 90 and United States v. Cameron, 573 F.3d 179, 185 (4th Cir. 2009) (emphasis in original)). In

United States v. Slade, the Fourth Circuit held, "[a]lthough Slade supplied large quantities of drugs to some co-conspirators, who, in turn, sold those drugs to their clientele, there is simply no evidence that Slade exercised any supervisory responsibility over these persons by controlling them or directing the terms of their sales." 631 F.3d at 191.

In this matter, as in Wilson and Slade, there is no evidence proving Mr. McCray's "***actual*** control over other people." Wilson, 832 Fed. Appx. at 155-56. Importantly, "the key issue here is whether [Mr. McCray] controlled people—not what people called him." Wilson, 832 Fed. Appx. at 155-56 (also observing that "A person's title alone cannot justify a sentencing enhancement," citing U.S.S.G. § 3B1.1 cmt. 4). Mr. McCray's participation in meetings is similarly insufficient to warrant a role enhancement because these conversations reveal very little about Mr. McCray's role in the purported DTO. See id. Again, there is no delineated organizational hierarchy in the PSR or a description of any individuals' ***actual*** roles.

A review of the recorded conversations in the wiretaps reveals that Mr. McCray did not possess an aggravated leadership role. For example:

- ¶19 – Mr. McCray appears to be about to engage in a transaction; however, Kenneth Brown warned and directed Mr. McCray not to conduct the transaction due to law enforcement in the area.
- ¶20 – Kevin Dukes reached out to Mr. McCray to supply him with drugs; there is no evidence of Mr. McCray providing direction or exercising leadership.
- ¶24 - Kendrick Smalls is referred to as one of Mr. McCray's distributors. However, that paragraph goes on to say that McCray purchased drugs *from* Smalls. Underlings do not typically sell drugs to leaders.
- ¶25 - video surveillance captured Corelius Walker making hand-to-hand sales. There is no evidence of Mr. McCray directing this conduct.
- ¶29, Probation indicates Mr. McCray was captured on video surveillance making drug sales and issuing orders to lower level-members of the DTO; however, there is no audio transmission of these so-called orders.
- The other so-called underling over which Mr. McCray ostensibly was the leader – Earl Allen - is not mentioned in the wiretap intercepts.

These recordings and self-serving proffer statements reveal little to nothing about Mr. McCray's actual role. There is no evidence that he punished other members for failing to abide by his orders, recruited accomplices or wielded consistent and repeated control over any other individual. See Wilson, 832 Fed. Appx. at 155-56 ("The record does not tell us if Wilson issued a command. In fact, it suggests that the subordinate made his or her own choice to sell drugs to generate money for payment, with no indication that Wilson controlled how the subordinate would sell drugs"); Slade, 631 F.3d at 191 ("[W]hile an unindicted co-conspirator did drive Slade to various locations to deliver cocaine base to his own clientele, there is no indication from the record that the co-conspirator did so pursuant to or as a result of any exercise of managerial or supervisory authority by Slade.").

As the Fourth Circuit has plainly instructed, "'being a buyer [or] seller of illegal drugs,

3

even in league with . . . five or more other persons, does not establish that a defendant has functioned as a[ ] . . . manager or supervisor of criminal activity." Wilson, 832 Fed. Appx. at 156 (quoting Sayles, 296 F.3d at 225 (internal quotation marks omitted)); see also United States v. Cameron, 573 F.3d 179, 185 (4th Cir. 2009)("There was no evidence that Cameron planned or organized the operation, exercised any control or authority over other participants, recruited accomplices into the operation, or claimed any share--much less a larger share--of the fruits of the criminal activity."). Perhaps most convincing is the plain language of §3B1.1 Application Note 4, which states:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles . . . are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning and organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

As described, Mr. McCray's "exercise of decision making authority" was limited and shared with other co-conspirators at best. There is no evidence that he personally recruited other participants or accomplices, nor evidence that he claimed any right to larger profit shares from the narcotics distribution set forth anywhere in the entire PSR. Similarly, there is nothing in the PSR to support the premise that Mr. McCray heavily participated in planning or organizing narcotics activity, or exercised any degree of control and authority over others. To the contrary, it is co-defendants like Tyrone Cox[1] and Terrell Kurt Myers who claimed the mantle of organizational leadership over the narcotics trafficking conspiracy. See e.g. PSR at ¶ 15(a) (indicating Cox as Mr. McCray's source of supply for 5 ounces of cocaine daily, and Cox advising he will provide more – 9 ounces – to Mr. McCray); PSR at ¶ 15(d) (discussing Mr. McCray's source of supply for cocaine, evidencing his middleman status within a larger narcotics distribution network); PSR at ¶ 16 (confirming Cox as Mr. McCray's cocaine source of supply in multiple narcotics transactions); PSR at ¶ 19 (referencing TII intercept wherein Mr. McCray's narcotics distributor directed Mr. McCray to change directions to avoid police); PSR at ¶ 21 (referencing TIII intercept wherein co-conspirator LaJustin Williams directed Mr. McCray to help sell methamphetamine); PSR at ¶ 22 (Mr. McCray's personal involvement in a hand-to-hand sale of a small amount of cocaine base is inimical to the claimed aggravating role); PSR at ¶ 27 (demonstrating Cox as a cocaine source of supply for Mr. McCray, to be provided by Cox from a full kilogram of cocaine in his possession); and PST at ¶ 30(a) (cooperating defendant (CD) indicating supplied Mr. McCray cocaine from 2020 to 2022, and CD sharing in profits).

---

[1] A 2-level aggravating role adjustment is not only supported by the facts proffered in the PSR, but also consistent with that of co-conspirator Tyrone Cox who, upon information and belief, was issued a 2-level aggravating role enhancement.

For the reasons set forth above, and Mr. McCray's routine direct participation in selling drugs, he is not an organizer or leader warranting a 4-level role adjustment. In summary, the record demonstrates only that Mr. McCray, like others, participated in a drug conspiracy; it does not demonstrate that he exercised actual control over any other member. Considering the facts set forth in the PSR, the applicable legal standards set forth in §3B1.1 and judicial precedent, Mr. McCray submits if any role adjustment is warranted, the role set forth in §3B1.1(c) is more consistent with findings set forth in the PSR and the record. The government has not satisfied its burden of establishing any greater aggravating role adjustment for Mr. McCray. In light of the above, Mr. McCray respectfully submits the final Guideline offense level is **37**.

## II. The Section 3553(a) Factors Support a Sentence Within the Range of the Statutory Minimum 15 Years but no More than Twenty Years' Imprisonment

As this Court is well aware, after correctly calculating the advisory Guideline range and ruling on any downward departures under the Guidelines, this Court is required to exercise its discretion by considering the relevant 18 U.S.C. § 3553(a) factors in setting the appropriate sentence. See United States v. Pauley, 511 F.3d 468, 473 (4th Cir. 2007). The statutory minimum term of imprisonment in this case is 10 years (Count One), and an additional 5 years (Count Three) to run consecutively, yielding a statutory minimum sentence of fifteen (15) years' imprisonment. The government agrees that Mr. McCray should not be sentenced as an Armed Career Criminal. See Government Letter dated January 10, 2024. A sentence of the mandatory minimum of 15 years, but no greater than 20 years, is more than sufficient to satisfy the statutory purposes of sentencing generally and, in particular, the mandate to impose a minimally sufficient sentence.

In determining the appropriate sentence, a court must consider, in addition to the purposes listed above: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner (3) the kinds of sentences available; (4) the sentencing range established by the guidelines; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

### A. *The Nature of the Offense and the History and Characteristics of Fredrick McCray*

An incarceration sentence within a range of 15-20 years certainly reflects "the seriousness of the offense." 18 U.S.C. § 3553(a)(2)(A). As set forth above, Mr. McCray left school in the sixth grade and was virtually unsupervised at home. His truancy and runaway

behavior began at the early age of 12. He was exposed to the narcotics trade as a young teenager, and grappled with his own substance abuse on a daily basis for years, until the night before his arrest on these charges. As indicated by Mr. McCray's nephew, his uncle experienced "a life marked by financial hardship and the looming threat of homelessness." See Defense Exhibit A. Undoubtedly, his traumatic childhood led to some of the misguided decisions in Mr. McCray's life. Id.

Despite being raised by parents who were young teens themselves when they had him, Mr. McCray has achieved success in his family life and employment. He has a "big heart" and prioritizes his family, ensuring that he has good relationships with his children and their mothers and maintains his financial commitments. PSR at ¶123. He has created a stable family environment, and upon his release Mr. McCray intends to regain full-time and stable employment via the landscaping company that he formed. Mr. McCray further intends to commit to his rehabilitative efforts while incarcerated, so that he will never be before this or any court again.

Notably, Mr. McCray stands before this Court at forty-four years old. If a minimum statutory sentence is imposed, Mr. McCray will be *fifty-nine years old* when he is released from prison and will be able to rebuild his life not as a young and troubled youth, but as a wiser and more disciplined senior citizen. Mr. McCray has been married for 12 years to a supportive and loving wife. He is also a dedicated and committed father of five (5) children and one stepson, with ages ranging from 6 months to 25 years old. PSR at ¶ 123; see also Defense Exhibit B. His children and wife should have the benefit of having Mr. McCray in their daily lives. While Mr. McCray fully accepts his responsibility for his criminal actions, it is important to note the world changed with the onset of COVID-19 in 2020. Throughout much of the period of the charged conspiracy, Mr. McCray found himself struggling with financial hardships as a direct result of COVID-related circumstances. The pandemic and restrictions that followed made it extremely difficult to maintain gainful employment and, due in large part to these financial struggles. Feeling as though he had no meaningful choice and needing to support his family, Mr. McCray made the ill-fated decision to return to criminal activity.

According to a study updated in March 2021, each year in prison takes two (2) years off an incarcerated individual's life expectancy. See Incarceration Shortens Life Expectancy, Widra, E. (June 26, 2017) (updated March 2021).2 Due to his age, an unnecessarily long period of incarceration will have an especially adverse impact on Mr. McCray, whose earliest release could be at 59 years of age. Additionally, as this Court is aware, the United States Sentencing Commission has studied the effects of aging on recidivism among federal offenders (the "Sentencing Commission Report"). See Sentencing Commission Report attached hereto as Exhibit A. The Sentencing Commission found that "[o]lder offenders were substantially less likely than younger offenders to recidivate following release[,]" and that "[a]ge exerted a strong influence on recidivism across sentence length categories." Accordingly, Mr. McCray's personal characteristics, especially his age, strongly favor a mandatory minimum sentence.

---

2 https://www.prisonpolicy.org/blog/2017/06/26/life_expectancy/.

### B. *The Retributive Purpose of Sentencing Warrants Mr. McCray's Requested Sentence*

Section 3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The statute is clear that the sentence must be no more than necessary to serve the punitive purpose, thereby framing the question for this Court: how long a prison term is minimally necessary to punish Mr. McCray?

Mr. McCray has been incarcerated on these charges since February 25, 2022. Should this Court impose the mandatory minimum sentence, Mr. McCray will have nearly thirteen (13) additional years within which to rehabilitate himself, in addition to his time served, to work on recovering and healing from his daily substance abuse, repent for his actions and commence rebuilding his life. Fifteen (15) years is a sufficiently long time to address the retributive purpose of the federal sentencing scheme. Were this Court to have any concerns that a statutorily minimum sentence would not adequately punish Mr. McCray, the ensuing years of mandatory supervised release should assuage those concerns. During that time, he will be strictly monitored by Probation. Any failure to comply with the exacting conditions that this Court sets will result in a violation and the threat of further prison; the repercussions will be swift and severe.

There is simply no question that a term of imprisonment of fifteen years, but no more than twenty years, with its attendant consequences – the removal of Mr. McCray from his family and, particularly, the stigma of a serious felony record and prison record, the crippling of his prospects for achieving financial stability when he is released, and the control and supervision that will be exercised over by the federal government for years to come after his release – is adequate to serve the punitive purpose of sentencing.

### C. *The Deterrent and Protective Purposes of Sentencing Warrants Leniency*

The sentencing statute also requires the Court to consider the "need for the sentence imposed . . . to afford adequate deterrence to criminal conduct" and the need to "protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B) & (C). The pertinent question for this Court is whether a term of imprisonment beyond fifteen to twenty years is a better, more certain deterrent than a sentence of the statutory minim term of imprisonment. In Mr. McCray's particular circumstances, the answer is a resounding "no." The requested sentence certainly provides ample deterrent value and will allow sufficient time for Mr. McCray to engage in rehabilitative and vocational services. In this matter, the mandatory minimum sentence serves as both an individual and general deterrent to future criminal conduct. As discussed, if a minimum statutory sentence is imposed, Mr. McCray will be *fifty-nine years old* when he is released from prison and is much less likely to recidivate as a senior citizen.

### D. *The Rehabilitative Purpose of Sentencing Warrants Mr. McCray's Requested Sentence*

Section 3553(a)(2)(D) requires the Court to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Today, Mr. McCray could benefit from therapeutic services to grapple with his unstable upbringing and persistent and daily substance abuse. He also could benefit from additional vocational training to expand his employment options upon his release from incarceration. The mandatory minimum sentence of fifteen years but no greater than twenty years' imprisonment will more than adequately serve the rehabilitative goals of sentencing here and will enable Mr. McCray to reenter society with additional therapeutic and vocational tools. Indeed, the journey of a person's rehabilitation commences upon the expression of remorse, and Mr. McCray consistently and fully accepted responsibility for his actions. As Probation recognized, Mr. McCray "advised he wanted to accept responsibility for his actions and serve his time in prison so he can move on with his life. Upon his release, McCray aspires to continue with his lawn care business and support his family." PSR at ¶ 125. These goals are laudable, and certainly achievable when coupled with the rehabilitative tools from which Mr. McCray can benefit while incarcerated. The statutory minimum sentence is appropriate here. Again, the supervision imposed thereafter will allow this Court to have a vigilant eye on Mr. McCray well into his sixties.

### E. *The Kinds of Sentences and the Need to Avoid Unwarranted Sentence Disparities*

A sentence of fifteen years but no greater than twenty years' imprisonment is also consistent with the kinds of sentences available, and it does not offend the aim of avoiding unwarranted disparity. Any disparity that results from the requested sentence is permissible first and foremost because rote deference to the Guidelines is no longer required after Booker. Moreover, the preference of the Guidelines is not to prevent all disparity, it is merely to avoid *unwarranted* disparity. The Court must conduct individualized sentencing to best achieve a fair sentencing.

Defendants with similar records convicted of similar conduct vary widely in their culpability, risk of recidivism, dangerousness, and rehabilitation needs, and the goal of individualized sentencing demands that courts account for their differences. Cf. Kimbrough v. United States, 552 U.S. 85, 107-08 (2007) ("some departures from uniformity were a necessary cost of the remedy we adopted."). Considering Mr. McCray's personal history, the sentenced requested herein and any resulting disparity are warranted.[3]

---

3 Under 3553(a)(6), the Court can disregard Career Offender designation. In this matter, the Career Offender designation does not affect Mr. McCray's final Guideline Offense Level of 37, as sought by Mr. McCray above. It does, however, change his Criminal History category from Level V to Level VI. PSR at ¶¶ 70-71. This adjustment results in a drastic change to the Guideline range of exposure, carrying 360 months to life imprisonment instead of 324-405 months' imprisonment. In 2004, the Commission found that sentences dictated by the Career Offender Guideline are among the most severe and the least likely to promote sentencing purposes. See 2004 Sentencing Commission Report at 133-34. Like the Commission, district judges have long recognized that the Career Offender Guideline calls for sentences that are too high in most of the cases it captures. The Commission has since disclosed that, since Booker, the proportion of those identified as career offenders sentenced within the applicable guideline

8

### III. Restitution

Restitution is not applicable in this case. 18 U.S.C. § 3663. Mr. McCray claims no assets and no single victim was named in the PSR.

### IV. Conclusion

Mr. McCray is substantially more than the worst thing he has ever done. He stands before this Court with remorse and full acceptance of responsibility for his actions, recognizing his involvement the charged conduct was the worst decision he has made in his life. He respectfully urges this Court consider his age and other individualized circumstances, the §3553 factors and its espoused aims in sentencing, in meting out the requested sentence in this matter. The recommended sentence would be "sufficient but not greater than necessary" to adhere to the principles of deterrence while at the same time, reflect the seriousness of his offense and promote respect for the law. More importantly, Mr. McCray can look forward to the day he will be a personal presence in his children's and grandchildren's lives and return to gainful employment.

With the continued love and support of his family, coupled with therapy to address his substance abuse, Mr. McCray will possess the tools to help him rehabilitate and move forward with his life. He will have support upon completing his federal sentence and will never be before this Court or any court again.

---

range decreased from 43.5% in 2005 to 27.5% in 2014. See 2016 Career Offender Report at 22. By 2021, judges imposed within-range sentences for only 19.7% of defendants deemed career offenders. See United States Sentencing Commission, Quick Facts: Career Offenders (2022). It is no surprise that the Commission identified the Career Offender Guideline as one of the least influential guidelines. See United States Sentencing Commission, The Influence of the Guidelines on Federal Sentencing at 55-56 (2020). In 2021, the difference between the average guideline minimum and the average sentence imposed had grown to 73 months. See U.S.S.C. Quick Facts: Career Offenders (2022). Thus, unlike other guidelines, whose influence has tended to stabilize over time, judges have diverged from the Career Offender Guideline in more cases and to a greater extent over time. Perhaps more troubling is the clear, disproportionate impact upon black males, one that has existed for many years. The Commission noted that 1,216 cases involving career offenders were reported in 2020. See U.S. Sentencing Commission, Quick Facts FY 2020 at 1. Of these, 96.8% were men and 60.8% were black. Id. These numbers essentially held steady when compared with those published in the two prior fiscal years. According to that study, approximately 53.0% of the individuals who were sentenced as career offenders received a variance below the guideline range.

Your Honor's consideration of this matter is greatly appreciated.

>Respectfully submitted,
>
>/s/ *Christopher J. Gramiccioni*
>
>Christopher J. Gramiccioni, Esq.
>*Counsel for Fredrick Wendell McCray*

Cc: AUSA Christopher Lietzow
USPO Latisha Flood
Fredrick Wendell McCray